STATE OF NEBRASKA, APPELLEE, V.
GARY E. HEITMAN, APPELLANT.
629 N.W. 2d 542

Filed July 13, 2001. No. S-00-429.

Thomas C. Riley, Douglas County Public Defender, and Cheryl M. Kessell for appellant.

Don Stenberg, Attorney General, J. Kirk Brown, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The appellant, Gary E. Heitman, after a bench trial, was convicted of criminal conspiracy to commit first degree sexual assault on a child. In this case, Heitman initiated the events by giving a 14-year-old girl an envelope containing a sexually suggestive letter, money, condoms, and his e-mail address. After exchanging numerous e-mail messages with a police officer who was posing as the girl, and after eventually agreeing to meet the girl for a sexual encounter, Heitman was charged with the crime of which he was convicted. Heitman contends that the evidence was insufficient to convict and that he was entrapped. We conclude there was sufficient evidence to support the conviction. We further determine that the district court was not clearly wrong in finding that Heitman was predisposed to commit the crime and that thus, the district court was correct in rejecting his entrapment defense.

## BACKGROUND

The record shows that on June 20, 1998, Heitman, age 53, drove to the drive-up window of a Bronco's restaurant in Omaha, Nebraska, and gave an envelope to a girl who was working at the window, whom we will refer to as "A.S." The envelope contained a $100 bill, three condoms, and a letter. The letter and other subsequently written materials in this case contain numerous spelling and grammatical errors. Because indicating each mistake would be distracting and correcting all of the errors poses the risk of altering the meaning of the messages, we have reproduced all written materials in their original form. See *U.S. v. Poehlman*, 217 F.3d 692 (9th Cir. 2000). The letter reads as follows:

> Hello!
> I have been driving thru many, many times buying the fish deluxe and a vanilla shake (I'm a vegatarian) and most times I am never evan hungary! I come thru just for a glimpse of you. The magic of brushing or touching your fingers in passing change is enough to send me to bliss till the next time you are the cutest most interesting looking

girl-woman around. I wish you were doing something else with your beauty, modeling or the like.

Take this go have a nice time, buy a sexy dress for your lover, save it for school. I may be to embarrased to drive thru anymore and I will save this much, in not buying food I don't need! Good Luck! & 2 old 4 U.

Written along the side of the letter was "My e-mail is IcanBgood@webtv.net Gary!" At the time A.S. received the envelope from Heitman, she was 14 years of age.

A.S. showed the envelope and its contents to her manager, who called the police. Heitman returned to Bronco's the following weekend. A.S. went to the back of the restaurant when she saw him. Someone at Bronco's wrote down Heitman's license plate number. The police were called, and Det. Steven J. Henthorn came to Bronco's and met with A.S. and her mother.

Henthorn told A.S. that he could e-mail Heitman, posing as her, let him know that A.S. was 14, and see what Heitman would do or that he could talk directly to Heitman. A.S. chose the e-mail option. Henthorn then began to send e-mail messages to Heitman, posing as A.S. Henthorn testified that he purposely included incorrect grammar and typing errors in the e-mail messages to make them appear more authentic. Henthorn testified regarding the various techniques he used in composing the e-mail messages, including providing Heitman with opportunities to cease contact. Henthorn admitted that he took a proactive approach to the investigation because there was not enough evidence that Heitman had committed a crime when he gave A.S. the envelope and its contents. In the e-mail messages, Henthorn did not use A.S.' real name, but instead used the name "Rodeo Queen," which we will use when referring to Henthorn's e-mail messages.

Rodeo Queen first sent an e-mail message on July 27, 1998, stating that a friend saw her receive the envelope from Heitman and had told Rodeo Queen's parents. Rodeo Queen wrote that her parents would not let her work at Bronco's if she talked to Heitman. She explained that she did not have a computer at home and that she was using a friend's computer. Henthorn testified that the friend, "Sue," was not a real person. Rodeo Queen then wrote, "ican not see you at work but if yowant me to write again just send the message bg yes if you dont just send bg no

sue says she will let me know." In the first message, Rodeo Queen did not state her age. Heitman replied with one message, stating "bg yes," and another, stating "A hundred ,thousand,million,trillion yes,s."

In her next e-mail, dated July 29, 1998, Rodeo Queen told Heitman her age. Rodeo Queen wrote:

> I am so glad that you think i should be a model my mom and dad say no that 14 is to young for that. maybe we could write to each other till i get my computer and my own email what do you think? hope to hear from you soon. it is so nice to talk to someone who understands me and my needs. i could go on all day but i better get this off.

Heitman sent the following reply:

> HI ! I must admit I am a little surprised to hear from you. . . . After the last time I drove thru your window at work. And was greeted so strangely by everyone, I havent been near the place since it was all to embarrassing. I feel the same about you, nothing has changed, I only want to say the last thing I want to see is any problems for you or for myself. How is it you are working at [Bronco's] and you are 14? . . . Love You me.

A little less than an hour later, Heitman wrote:

> Hey, ok, so It is going to be difficult for me to be just a freind. it must be pretty clear to you in light of my first offering to you. I only hope to God you didnt think I was offering you money for sex. . . . The condoms, I don't know were just a spur of the moment thing, I guess I was feeling, you being what you are, young, alarmingly beautiful , sweet and probably quite intelligent. Would have a long line of guys waiting to be the one. They were a symbol from me to protect yourself.

Rodeo Queen replied that she was able to get a work permit to work at Bronco's, explained that she used the name "Rodeo Queen" because she liked horses, and reminded Heitman that it was best if he did not go to Bronco's. Rodeo Queen wrote that her friend Sue was the only one who understood her. She then added that "boyes well just forget it the ones my age dont know anything about girls and i am just to young for the older guys at school it is such a pain." Heitman replied in part, "Rodeo Queen

I Love You . . . . Its crazy but true,maybe I shouldnt write you anymore . . . . I have no defenses against a beautiful woman no matter the age. I will write if written to Love you." Rodeo Queen next wrote:

> I thought that the money was for a sexy outfit Ididnt know if you wanted me to model it for you i didnt think that you paying me to have sex with you not that that would be all-wrong i guess sometimes i have these thoughts and feelings that i need to take care of. Sue and i talk about this and sometimes we do well you know i just want you to know that i am not mad at you and i was wondering why you gave me 3 rubbers i just thought you could use that many if you know what I mean. i will tell you somerthing if you promise not to tell and that i dont know much about guys excpt what sue and i talk about i dont know what they like and what they dont like what i can do to make them happy. When i got that stuff from you i thought maybe a real man was going to teach me dont know if i was wrong or not. sorry about you not being able to come around but if anyone sees you mom says i cant work ther any more Rodeo Queen

Heitman replied:

> OK So I am wanting to be the one, that wants you the most. I m yours to do whatever you want with me. And I will be a gentleman with and for you as you learn your way around. Excuse me if I am if I am missunderstanding you but are you telling me that Sue and you are fooling around or sex-ually involved, if you are that is to hot . . . Love You me

On July 30, 1998, after exchanging several more e-mail mes-sages, Heitman wrote a lengthy message telling Rodeo Queen about himself. In the message, Heitman stated, "First I want to say I dont know where this Love will take me,I just hope it isnt to jail." Heitman also wrote, "All my love affairs and 2 sons have been thru much younger women, I cant ever remember dating or seeing someone my own age its not something I worked at it just happens . . . ."

Heitman next sent an e-mail message to Rodeo Queen asking what color her fingernails were on the day that he gave her the envelope. Without answering the question, Rodeo Queen replied that her mother had seen a vehicle like the one Heitman drove

and indicated that her parents discussed sending her away. In the same e-mail message, Rodeo Queen then wrote:

> I dont want to leave you now that i know you. there is so much to learn and i was hoping that you could be my teacher. I dont want you to think that sue an I are gay we just share everything she is a yer younger that i am . . . so you wnat to make love to me :) can you tell me how you would do that. you said that you have had younger girl-friends like me did you teach them to.

Heitman replied, stating that he wanted to continue to communicate but that he needed to know the color of Rodeo Queen's fingernails on the day he gave her the envelope. Heitman then wrote:

> ITs because I am paranoid, I am not sure you are who you say you are. And no I am not a pedophile someone who is only attracted to young people this is nothing like that. Whn I said all my experiences with women were all much younger than me it is the truth they were all of legal age though you are new and somewhat frightening territory for me and as I said before I dont want any problems for you or myself. You must remember the color you wore it for a long time---Guess

Heitman also asked if Rodeo Queen could not tell him the color of the fingernail polish, he would like her to call him because he knew her voice. Henthorn testified that he did not know the color of A.S.' fingernail polish. Henthorn wrote to Heitman as Rodeo Queen, replying that she did not remember. Henthorn testified that he also gave Heitman an opportunity to get out of the situation by writing that Rodeo Queen would understand if Heitman did not want to write to her anymore. Heitman replied:

> ok you know how I feel about you, i am not sure where to go from here. I had no Idea you are as young as you are! We need to start out slowly as freinds ok. I dont want to loose any of the confidence you may have in me. -------
> Love You

Heitman and Rodeo Queen exchanged several more e-mail messages regarding the possibility of conversing by telephone, the possibility of not continuing to correspond, and Heitman's trust

in Rodeo Queen. In one of the messages, Heitman stated, "Please dont end this if I am willing to risk my freedom for you . . . ." One of Rodeo Queen's messages was signed, "Love your Rodeo Girl." Rodeo Queen then agreed to call Heitman.

Henthorn arranged to have A.S. call Heitman on July 30, 1998. During the call, Henthorn monitored the conversation and wrote notes to A.S. telling her what to say. A.S. called Heitman and told him that she thought the color of her fingernail polish was green but that she was not sure. Heitman agreed that it was green. During the conversation, Heitman indicated that he could be sexually creative. A.S. encouraged him to use e-mail to describe how he could be sexually creative.

After the telephone call, Heitman wrote a lengthy and detailed message to Rodeo Queen describing a sexual encounter between himself, Rodeo Queen, and Sue in a park, which he attached to an e-mail message. Heitman then wrote an e-mail message expressing his love for Rodeo Queen and stating that he was sending her something that was part fantasy mixed with his desires for her. He stated that if it offended her, he would stop. In a separate message, Heitman stated, "Yes if I were to take your virginity, 3 rubbers may be insufficient or I may choose not to use them at all." In another message, referring to the attachment, Heitman stated, "Well, you did ask me in your first note of the day yesterday how I planned on making Love to you. This is how I would begin. So let me know what you think."

On July 31, 1998, after several e-mail messages were exchanged between Rodeo Queen and Heitman, Rodeo Queen wrote:

> we got it we got it i can hardly type i am so excited i cant believe that you understand me so well sue and i are so happy that you want to include her to we had hoped that you would but was afraid to ask we thought that was to much to hope for what you wrote is wonderful i can hardly wait to hear more i will be back this afternoon :) :) :) :) :)
> Rodeo Queen

After Heitman wrote several more e-mail messages describing his fantasies of sexual encounters between him, Rodeo Queen, and Sue, Rodeo Queen replied, "i am so glad that you are letting me know how i can make you happy you will not believe how

happy sue and i are and we will be even happier later thinking about you the whole time."

On August 1, 1998, Heitman wrote an e-mail message stating he would like to purchase sexual items for both Rodeo Queen and Sue to keep in their rooms and that he had bought them each something to wear. Heitman stated that Rodeo Queen and Sue were to give some thought as to how he could get the items to them. Heitman also sent several messages asking for details regarding any sexual encounter that might have happened between Rodeo Queen and Sue. Rodeo Queen replied:

> you caouldnt believe how good it was sue and i decided that since you are the special one and the teacher we are going to tell you all about it together we dont want you to stop writing so we will just have to surprise you . . . you really havent told me what you would want us to do to make you as happy as we are

Heitman responded that he would like Rodeo Queen and Sue to fall in love and stated, "It is going to be very difficult for you and I to be lovers as I would like. I would like Sue to be there to serve you as I cant."

Rodeo Queen replied, "we are not teasing believe me we have a big surprise for you i thought we would wait until till we knew for sure.i think that we can get away for 3 to4 hours so we can all get together." In another message, Rodeo Queen wrote:

> i do not know if things are moving to fast or what i dont know if you want to try to get together or if you just want to keep it this way it seems like i have been waiting forever for some like you and now that you are here i cant believe it we want to be laying nesxt to you on either side and be telling you what we did we think that is something that you would like am i wrong . . . Love your Rodeo Queen

Several more e-mail messages were then exchanged, including one in which Heitman stated that what would make him happy would be if Rodeo Queen and Sue let him watch them make love to each other. Heitman then wrote a long e-mail message stating that he did want to meet them and asked if they would wear sundresses. In his message, Heitman stated that there was more in the bargain than he had thought or hoped, adding, "I only hope it doesnt double my jail sentence as well." Rodeo Queen replied that

she and Sue had purchased sundresses and included a suggestion that she and Sue would perform oral sex on each other when they met with Heitman. Heitman then wrote a short e-mail message of a sexual nature, followed by another lengthy description of a sexual encounter between himself, Rodeo Queen, and Sue.

Henthorn, now posing as both Rodeo Queen and Sue, continued to exchange e-mail messages with Heitman. In these messages, Rodeo Queen wrote that her parents were taking her on a trip to Kansas and that they had only 2 more days before she would leave. Rodeo Queen then suggested that they meet for the first time in a motel room. Additional messages between Heitman and Rodeo Queen were sexual in nature, and others were in regard to setting up a meeting on Wednesday, August 3, 1998, at a motel. In one message, Rodeo Queen wrote, "we are glad that you know how to do it without hurting us we were worried that it would hurt." Heitman replied, "That it will be painfree is difficult to say . . . ." In another message, Heitman asked if Rodeo Queen and Sue expected to remain virgins through Wednesday. Rodeo Queen replied, "no a hundred thousand million trillion times no we want to give everything we can to you."

Also on August 2, 1998, Henthorn arranged to have A.S. make another telephone call to Heitman. During the telephone call, Heitman and A.S. discussed arrangements for meeting at a motel. Heitman suggested that it might be nice to meet in a "more innocent" place at first. In response, A.S. stated that they did not have much time. At times, the conversation between Heitman and A.S. was sexual in nature. Heitman told A.S. that he wanted A.S. to wear stockings at the meeting, while A.S. asked Heitman if he wanted Rodeo Queen and Sue to leave their underwear at home. After the telephone call, more e-mail messages were exchanged regarding the meeting at the motel. In these messages, Rodeo Queen continued to express her excitement about meeting and continued to include sexual suggestions in some of the messages. In one of Heitman's last messages, he wrote in part that "[t]he reality is, I have no master plan. I have tried to imagine things as I think they may or should take place. And have decided to let nature take its own course."

On August 3, 1998, the police arrested Heitman at the motel. In the motel room, police found the prescription drug Viagra,

two sundresses, two packages of sheer stockings, five condoms, flavored lubricant, three vibrators, a package of batteries, a videotape entitled "The Lover," two pairs of panties, and a man's robe. The refrigerator contained three bottles of beer, two soft drinks, and a bucket of ice.

Heitman signed permission forms for the officers to search his vehicle and apartment. In his vehicle, the police found a Bronco's napkin. At Heitman's apartment, the police seized a Sony webtv system. The police also found a sheet of paper which listed words such as "Model outfit 'yes,'" "No $ 4 sex 'no,'" and "we got it we got it." Written twice on the side of the letter was "entrapment???" with lines drawn through it.

In finding Heitman guilty, the district court noted that Heitman was the one who had initiated the contact and then had returned to Bronco's a week later. The court found that there had been multiple overt acts in furtherance of a conspiracy. The court then stated:

As to any issue of whether or not he was predisposed to commit this offense, I — the examples are so numerous that we again would be sitting here all day if I went through every example of every e-mail and the physical exhibits that were received, but just some kind of note, the fact is he approached her and gave her the letter . . . on June the 20th of 1998, not the other way around. Also, the Defendant returned the following Saturday to the Bronco's store. The fact that the Defendant double-checked her on the color of her fingernail polish that she wore on June 20th when he saw her to deliver the note indicates what his intent was, what his purpose was, but that he was trying to be careful so that he wouldn't get caught. He also, I note, at least four times in the e-mail transmissions is given an option to break off the contact with this little girl by the police and he ignores all four options. . . . [T]here is an e-mail transmission where the Defendant makes a statement that he has no defense against beautiful women — now, he is talking, he thinks, to a 14-year-old girl — no matter what the age, so it is very apparent that it's been impressed upon him her age. Also . . . I hope this love won't take me to jail.

So it is very apparent that the Defendant is predisposed to commit the offense and that he is being as careful as he can not to get caught committing the offense, but that he is definitely going to give it a try if he thinks that the road's in his favor of successfully completing this sexual liaison with 14- and 13-year-old girls.

The district court sentenced Heitman to 8 to 12 years' imprisonment. Heitman appeals.

## ASSIGNMENTS OF ERROR

Heitman assigns, rephrased, that the district court erred in (1) finding him guilty when there was insufficient evidence to establish a conspiracy, (2) finding that he was not entrapped, and (3) imposing an excessive sentence.

## STANDARD OF REVIEW

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001); *State v. Roberts*, 261 Neb. 403, 623 N.W.2d 298 (2001).

Facts constituting entrapment are ordinarily to be determined by the jury or trier of fact in each individual case, and its findings will be disturbed on appeal only when the preponderance of the evidence against such findings is great and they clearly appear to be wrong, or when the findings are clearly contrary to law. *State v. Parks*, 212 Neb. 635, 324 N.W.2d 673 (1982); *State v. Ransburg*, 181 Neb. 352, 148 N.W.2d 324 (1967).

## ANALYSIS

At the outset, we note that the State argues that this case should be dismissed for lack of jurisdiction. Specifically, the State argues that Heitman filed a motion to proceed in forma pauperis in which he failed to state in his poverty affidavit the nature of the action, defense, or appeal and a statement of his belief that he is entitled to redress as required by Neb. Rev. Stat. § 25-2301.01 (Cum. Supp. 2000). We reject this argument. See *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000).

CONSPIRACY

Heitman contends that there was insufficient evidence to convict him of conspiracy to commit first degree sexual assault on a child. In particular, Heitman argues that there was no evidence of an agreement to commit sexual penetration.

Heitman was charged with conspiracy to commit sexual assault on a child under Neb. Rev. Stat. § 28-319(1) (Reissue 1995). Section 28-319 provides that "[a]ny person who subjects another person to sexual penetration . . . when the actor is nineteen years of age or older and the victim is less than sixteen years of age is guilty of sexual assault in the first degree."

Neb. Rev. Stat. § 28-202 (Reissue 1995) provides:

(1) A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:

(a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and

(b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

. . . .

A person prosecuted for a criminal conspiracy shall be acquitted if such person proves by a preponderance of the evidence that his or her conduct occurred in response to an entrapment.

We have held that in enacting § 28-202, the Legislature adopted the unilateral approach to the agreement element of conspiracy as found in the Model Penal Code. See, *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995); *State v. Knight*, 239 Neb. 958, 479 N.W.2d 792 (1992); *State v. John*, 213 Neb. 76, 328 N.W.2d 181 (1982); Model Penal Code § 5.03 (Tent. Draft No. 10, 1960). Under the unilateral approach, only the defendant need agree with another person; the second party can feign agreement. *Id.* This principle applies equally when the party who feigns agreement is a government agent. See *State v. John, supra*. Accordingly, the fact that Heitman's agreement was made with an officer who was posing as A.S. does not preclude his conviction for conspiracy.

In addition to an agreement, a criminal conspiracy requires an " 'overt act.' " *State v. Hansen*, 252 Neb. 489, 500,

562 N.W.2d 840, 849 (1997). Accord *State v. Copple,* 224 Neb. 672, 401 N.W.2d 141 (1987). An overt act manifests that a conspiracy is " 'still at work.' " *Hansen,* 252 Neb. at 500, 562 N.W.2d at 849. Accord *State v. Copple, supra.* It tends to show a preexisting conspiracy and manifests an intent or design toward accomplishment of a crime. *Id.* An overt act, however, need not have the capacity to accomplish the conspiratorial objective and does not have to be a criminal act. *Id.*

Heitman argues that there was insufficient evidence to convict him of conspiracy to commit first degree sexual assault on a child because there was no evidence of an agreement to engage in penetration. Although Heitman's correspondence indicated his desire to watch Rodeo Queen and Sue engage in sexual activities and he indicated at times that he could not engage in sexual penetration with them, the record also contains evidence that Heitman did intend to engage in sexual penetration. During his first telephone conversation with A.S., when asked what he was comfortable with, Heitman stated, "I'm happy going all the way." Heitman later stated that he could not guarantee that his experiences with Rodeo Queen and Sue would be "painfree." In one message, Heitman asked Rodeo Queen and Sue if they intended to remain virgins through the day of the planned meeting. Rodeo Queen answered that they did not. Heitman did nothing to refute the impression that Rodeo Queen and Sue were expecting to engage in sexual intercourse with him. Rather, Heitman went to the motel as planned and took Viagra and condoms with him. As the district court noted, these items speak for themselves and provide compelling evidence that he agreed to engage in acts involving sexual penetration with Rodeo Queen and Sue. Additionally, by renting the motel room and bringing condoms, Viagra, and other items of a sexual nature to the room, Heitman also engaged in an overt act in furtherance of the conspiracy. After viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of conspiracy to commit first degree sexual assault on a child beyond a reasonable doubt. Accordingly, we find Heitman's first assignment of error to be without merit.

## ENTRAPMENT

 Heitman next contends that he was entrapped. Entrapment is the governmental inducement of one to commit a crime not contemplated by the individual in order to prosecute that individual for the commission of the criminal offense. *State v. Graham*, 259 Neb. 966, 614 N.W.2d 266 (2000). Entrapment is an affirmative defense consisting of two elements: (1) the government induced the defendant to commit the offense charged and (2) the defendant's predisposition to commit the criminal act was such that the defendant was not otherwise ready and willing to commit the offense. See *id.*

 Entrapment is in the nature of an affirmative defense, and thus, the burden of going forward with evidence of government inducement is on the defendant. *State v. Connely*, 243 Neb. 319, 499 N.W.2d 65 (1993). The defendant need only adduce " ' "more than a scintilla" ' " of evidence to satisfy this initial burden. *State v. Stahl*, 240 Neb. 501, 510, 482 N.W.2d 829, 837 (1992), quoting *State v. Parks*, 212 Neb. 635, 324 N.W.2d 673 (1982). See *State v. Graham, supra.* The defendant need not present evidence of entrapment; he or she can point to such evidence in the government's case in chief or extract it from cross-examination of the government's witnesses. *U.S. v. Poehlman*, 217 F.3d 692 (9th Cir. 2000).

 When the defendant produces sufficient evidence to raise the defense, the question of entrapment becomes one of fact. The burden is on the State to prove beyond a reasonable doubt that the defendant was not entrapped. *State v. Connely, supra*; *State v. Stahl, supra.* The standard of review is a limited one. Facts constituting entrapment are ordinarily to be determined by the jury or trier of fact in each individual case, and the findings will be disturbed on appeal only when the preponderance of the evidence against such findings is great and they clearly appear to be wrong, or when the findings are clearly contrary to law. *State v. Parks, supra*; *State v. Ransburg*, 181 Neb. 352, 148 N.W.2d 324 (1967).

## INDUCEMENT

 Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would

commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship. See, e.g., *U.S. v. Poehlman, supra.* Inducement requires, however, something more than that a government agent or informant suggested the crime and provided the occasion for it. See, e.g., *U.S. v. Dozal-Bencomo,* 952 F.2d 1246 (10th Cir. 1991). Thus, an inducement consists of an opportunity plus something else such as excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, noncriminal type of motive. *Id.,* citing *U.S. v. Gendron,* 18 F.3d 955 (1st Cir. 1994).

In *U.S. v. Poehlman, supra,* a government agent posed as a woman seeking someone who would understand her family's " 'unique needs.' " 217 F.3d at 695. Poehlman, who was a cross-dresser and foot fetishist, initially sought only an adult relationship with the woman. The woman, however, sent e-mail messages to Poehlman in which she made it clear that she was asking Poehlman to engage in sexual activities with her children. Throughout the course of the correspondence, the woman showed acceptance of Poehlman and encouraged him to come and live with her family. After some resistance, Poehlman eventually agreed to meet the woman and act as a " 'special man teacher' " for her children. *Id.* at 696. Poehlman was convicted of crossing state lines for the purpose of engaging in sex acts with a minor. After determining that the government played on Poehlman's need for an adult relationship and for acceptance of certain sexual proclivities, the Ninth Circuit concluded that "[t]hrough its aggressive intervention, the government materially affected the normal balance between risks and rewards from the commission of the crime, and thereby induced Poehlman to commit the offense." *Id.* at 702-03.

In this case, the State went beyond simply providing Heitman with the opportunity to commit the crime. Instead, Henthorn sent Heitman numerous e-mail messages aimed at affecting his emotions and desires. Posing as A.S., Henthorn indicated to Heitman that Heitman was one of the few people who seemed to understand Rodeo Queen and indicated that Rodeo Queen wanted Heitman to be her sexual teacher. Henthorn, as Rodeo Queen, then mirrored Heitman's expressions of love for A.S. by

signing some of Rodeo Queen's letters with the word love. Rodeo Queen specifically requested that Heitman provide a description of how he would engage in sexual activity with her and encouraged him to continue writing such descriptions. Of most importance, it was Rodeo Queen, and not Heitman, who first suggested meeting at the motel. Rodeo Queen created a sense of urgency for the meeting to occur through letters from Rodeo Queen to Heitman in which she stated that she was going out of town for a period of time. During the second telephone call to A.S., when Heitman suggested they meet some place more innocent, A.S. reminded him that there was not much time. Thus, the State went beyond merely providing an opportunity to commit the crime, but instead encouraged Heitman to respond to Rodeo Queen's e-mail messages in a sexual manner and urged him to continue to think of her sexually.

We further note that the district court did not specifically discuss the element of State inducement, and instead discussed only the element of predisposition. Additionally, the State, both at trial and on appeal, focused its arguments on the issue of predisposition. Under the facts of this case, we conclude that the State induced Heitman to commit the crime.

## PREDISPOSITION

Despite the fact that he was induced to commit the crime, Heitman could still be found guilty if he was predisposed to commit the crime. See *U.S. v. Poehlman*, 217 F.3d 692 (9th Cir. 2000). Heitman argues that he was not predisposed to commit the crime and points to evidence that he initially wrote to Rodeo Queen that they were just friends, that he initially thought she was 16 years of age, and that his writings regarding sexual activity were simply expressions of fantasy.

Where the government has induced an individual to break the law, the government must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by government agents. *Jacobson v. United States*, 503 U.S. 540, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992); *U.S. v. Poehlman, supra*. Predisposition to commit the criminal act must be independent and not be the product of the attention the government directed at the defendant. See, *id*; *State*

*v. Connely*, 243 Neb. 319, 499 N.W.2d 65 (1993) (discussing jurisdictions critical of *Jacobson*, but agreeing that predisposition to commit crime must exist prior to and independent of government's contact). This is not to say, however, that statements made after the government's inducement can never be evidence of predisposition. If, after the government begins inducing a defendant, he or she makes it clear that he or she would have committed the offense even without the inducement, that would be evidence of predisposition. *U.S. v. Poehlman, supra.* "But only those statements that indicate a state of mind untainted by the inducement are relevant to show predisposition." *Id.* at 704-05. Predisposition may be shown by circumstantial evidence. See *State v. Parks*, 212 Neb. 635, 324 N.W.2d 673 (1982).

In *Jacobson v. United States, supra*, the U.S. Supreme Court reversed Jacobson's conviction of receiving child pornography through the mail. Government officials had discovered Jacobson's name on the mailing list of an adult bookstore from which he legally ordered two magazines and a brochure depicting nude children. Shortly after the legal purchase, Congress enacted the Child Protection Act of 1984, making such purchases illegal. Through five fictitious organizations and a bogus pen pal, the government made repeated efforts to explore Jacobson's willingness to break the new law by sending him various mailings. Many of the mailings represented that they were founded to protect freedom of choice and that they promoted lobbying efforts through catalog sales. After 2½ years, Jacobson ordered a magazine depicting young boys engaged in sexual activities. Jacobson was arrested, and a search of his home revealed no materials other than those sent by the government and the purchase he had made legally. The Court ruled that the defendant's conviction could not stand because the government failed to prove that the defendant's predisposition was independent and not the product of the attention that the government had directed at the defendant over the 2½-year period. See, also, *U.S. v. Poehlman, supra* (defendant not predisposed to commit crime when government, utilizing e-mail, initiated all suggestions of improper activity, defendant actively resisted, government actively appealed to defendant's emotions, and no evidence of prior interest by defendant to seek sexual activity with children was presented).

In this case, when it analyzes whether Heitman was predisposed to commit the crime, a court may only consider evidence that he was predisposed before the State became involved. Accordingly, information from the e-mail messages can be used only to the extent that they show a predisposition before the time that the State became involved. Therefore, the district court was in error when it considered facts such as Heitman's concern about the color of fingernail polish A.S. was wearing, that he ignored opportunities provided by the police to break off the contact, and that he made statements indicating that he knew what he was doing might be illegal. Nothing about these facts helps to differentiate between Heitman's state of mind before the State's involvement and afterward.

The district court also considered, however, the envelope that Heitman gave to A.S. before the State became involved and his statement in an e-mail message of "I have no defenses against a beautiful woman no matter the age." We additionally note that in another e-mail message, Heitman stated, "It is going to be difficult for me to be just a freind. it must be pretty clear to you in light of my first offering to you." All of these are relevant to Heitman's state of mind before the State became involved and indicate that Heitman was predisposed to commit the crime. In particular, the contents of the envelope that Heitman gave to A.S. provide an inference that he had a predisposition to seek sexual intercourse with her. The letter was flattering and mentioned sexuality by suggesting that A.S. use the $100 included with the letter to buy a sexy dress for her lover. More important, the envelope contained three condoms. Heitman then provided the means for A.S. to contact him by including his e-mail address, IcanBgood@webtv.net, which also could be interpreted to have a sexual meaning. This case is unlike *Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L. Ed. 2d 174 (1992), and *U.S. v. Poelhman*, 217 F.3d 692 (9th Cir. 2000), where it was the government who initiated contact or suggestions of impropriety. In this case, it was Heitman who initiated the events by giving a 14-year-old girl a sexually suggestive letter, money, condoms, and his e-mail address. `

Heitman argues that he thought A.S. was 16 at the time he gave her the envelope. This argument ignores the fact that

consent or reasonable mistake as to the age of the victim is not a defense to first degree sexual assault on a child under § 28-319. *State v. Campbell*, 239 Neb. 14, 473 N.W.2d 420 (1991). As long as Heitman agreed to engage in sexual penetration with A.S., regardless of what he thought her age was, he could be found guilty of conspiracy to commit first degree sexual assault on a child. It is Heitman's predisposition to seek sexual penetration with A.S. that is at issue, not whether he was aware of her age.

Heitman also points to other evidence in the record indicating that he initially intended to be only friends with A.S. Heitman further argues that any sexual correspondence was simply his expression of fantasy. In addition, the record does contain evidence that Heitman had never previously dated a person under the age of 16 and that he was cautious at times about becoming sexually involved with A.S.

The fact that there is evidence supporting Heitman's position, however, is not determinative. Rather, under our standard of review, facts constituting entrapment are ordinarily to be determined by the jury or trier of fact in each individual case, and the findings will be disturbed on appeal only when the preponderance of the evidence against such findings is great and they clearly appear to be wrong, or when the findings are clearly contrary to law. *State v. Parks*, 212 Neb. 635, 638, 324 N.W.2d 673, 676 (1982); *State v. Ransburg*, 181 Neb. 352, 148 N.W.2d 324 (1967). The district court determined as a factual finding that Heitman was predisposed to commit the crime. The district court's finding of predisposition was supported by evidence in the record, and although there was evidence against the findings, it was not so great as to make the factual finding clearly wrong. Accordingly, under our standard of review, the district court did not err in rejecting Heitman's entrapment defense.

SENTENCING

■ Heitman contends that the district court imposed an excessive sentence. Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. *State v. Holecek*, 260 Neb. 976, 621 N.W.2d 100 (2000); *State v. Carlson*, 260 Neb. 815, 619 N.W.2d 832 (2000). Heitman was convicted of a Class II

felony, which is subject to a maximum sentence of 50 years' imprisonment and a minimum of 1 year's imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2000). We determine that the district court did not abuse its discretion in sentencing Heitman to 8 to 12 years' imprisonment. Accordingly, Heitman's assignment of error is without merit.

## CONCLUSION

We determine that there was sufficient evidence to convict Heitman of conspiracy to commit first degree sexual assault on a child. We further determine that the district court did not err in rejecting Heitman's entrapment defense. Finally, we determine that the district court did not abuse its discretion in sentencing Heitman to 8 to 12 years' imprisonment. Accordingly, we affirm.

AFFIRMED.