STATE OF NEBRASKA, APPELLEE, V.
SHIREEN D. TYMA, APPELLANT.
651 N.W.2d 582

Filed October 4, 2002.    No. S-01-1070.

Robert Wm. Chapin, Jr., for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Shireen D. Tyma (Tyma) was charged by information in the district court for Hall County with conspiracy to commit murder in the first degree, a Class II felony. The object of the alleged conspiracy was Tyma's estranged husband, Tim Tyma (Tim). Following a bench trial, Tyma was convicted and sentenced to incarceration for 8 to 15 years. She perfected this direct appeal from her conviction and sentence. We removed the appeal to our docket on our own motion pursuant to our authority to regulate the caseloads of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## BACKGROUND

Prior to the filing of the information, the county court for Hall County issued three search warrants based upon affidavits submitted by Officer Kelly Williams of the Grand Island Police Department. The first warrant authorized the search of Tyma's residence in Grand Island and any vehicles registered to Tyma and/or Jasper and Shirley Leago, her parents. The execution of this warrant resulted in the seizure of various items of personal property from the residence, including videotapes, notes, notebooks, and 21 rolls of undeveloped 35-mm film. The second search warrant authorized the search of the Leagos' residence in Grand Island. Its execution resulted in the seizure of a .38-caliber Smith & Wesson five-shot revolver, serial No. J53212, in a brown holster with four rounds in the cylinder. The third search warrant was accompanied by an order requiring Tyma to submit a handwriting sample, which was subsequently obtained.

After she was charged but prior to trial, Tyma filed a motion to suppress the handwriting sample, all evidence seized from her residence, and any other evidence seized from "any other place in which she had an expectation of privacy." After conducting an evidentiary hearing, the district court entered an order suppressing the handwriting sample as violative of Neb. Rev. Stat. § 29-3303(3) (Reissue 1995), which provides that in order to obtain a warrant for evidence of "identifying physical characteristics," the affidavit must affirmatively show that the identified or described individual has refused to voluntarily provide the desired evidence. The court also suppressed all evidence seized from Tyma's residence based upon its determination that the factual assertions set forth in Williams' affidavit were not sufficiently corroborated and that the affidavit therefore failed to show probable cause. The court also determined that Tyma lacked standing to challenge the search of the Leagos' residence and the resulting seizure of the .38-caliber revolver and thus overruled the motion to suppress as to that evidence.

The State perfected an interlocutory appeal of the district court's ruling on Tyma's motion to suppress to a single judge of the Nebraska Court of Appeals pursuant to the summary review procedure provided by Neb. Rev. Stat. § 29-824 (Cum. Supp. 2000). In an unpublished opinion, the reviewing judge determined that Williams' affidavits established probable cause to believe that a crime had been committed and that evidence thereof would be found in Tyma's residence. *State v. Tyma*, No. A-00-764, 2000 WL 1673125 (Neb. App. Oct. 31, 2000) (not designated for permanent publication). The judge therefore reversed that part of the district court's order suppressing the evidence seized at Tyma's residence. However, the judge affirmed that part of the district court's order suppressing the handwriting sample for failure to comply with § 29-3303(3) and remanded the cause to the district court for proceedings consistent with the opinion.

Following remand but prior to trial, Tyma filed a motion to dismiss on the ground that her right to a speedy trial had been violated. At a pretrial hearing on July 27, 2001, the State offered a "Waiver of Right to Speedy Trial" executed by Tyma and her attorney, which was received without objection. At the conclusion of the hearing, the court took the motion under advisement.

A bench trial was held on August 1, 2001. The State called several witnesses, including Tim, Kenneth Moore, and Leo Purvis. Tim identified Tyma's handwriting on several documents offered in evidence by the State. Moore and Purvis testified concerning their oral and written communications with Tyma regarding the planned killing of Tim, which we will discuss in greater detail in our analysis of Tyma's assignment of error challenging the sufficiency of the evidence to support her conviction.

Tyma called two witnesses at trial. Williams, the police officer who had executed the affidavits upon which the search warrants were issued, testified that during the investigation, he asked Purvis on two occasions to "[w]ear a wire" in order to surreptitiously record conversations with Tyma. On the first occasion, no tape recording was made because of a technical malfunction. On the second occasion, a recording was made and subsequently transcribed by Williams. Tyma offered the transcript of that conversation, which was received in evidence.

Jasper Leago testified he had been in possession of the .38-caliber revolver for approximately 25 years before it was seized from his residence pursuant to the search warrant. He stated that he was unaware the weapon had been removed from his home during 1999. He explained that the weapon did not appear to have been moved from the location in the home where he stored it, that he kept the house locked when he was away, and that Tyma did not have keys to the residence. Leago testified that he had never seen the weapon in the possession of Tyma or Moore, but he said that during a conversation with Moore in early 1999, he mentioned the fact that he owned a .38-caliber Smith & Wesson revolver, which he described in some detail.

The record includes a docket entry dated August 21, 2001, stating: "Motion to Dismiss overruled. Defendant found guilty. Sentencing 9/25/01." The sentence was pronounced from the bench at a sentencing hearing on September 25, 2001, and in a journal entry bearing the same date.

## ASSIGNMENTS OF ERROR

Tyma assigns that "the Court of Appeals erred when modifying the lower courts [sic] decision to grant Appellant's Motion

to Suppress in total by ruling that the handwriting samples had not been improperly seized." She further assigns, restated, that the district court erred in (1) allowing Tim to identify her handwriting, (2) failing to exclude Purvis' testimony pursuant to Neb. Rev. Stat. § 29-2262.01 (Reissue 1995), (3) finding that she had conspired with Moore and Purvis to murder Tim when no evidence of any agreement between herself and Moore or Purvis was adduced, (4) holding that her right to a speedy trial had not been denied, and (5) finding that her due process rights had not been denied by the conduct of the State.

## STANDARD OF REVIEW

■ Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002); *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002).

■ A conviction in a bench trial of a criminal case is sustained if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002).

■ On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Davlin, supra; State v. Gartner*, 263 Neb. 153, 638 N.W.2d 849 (2002); *State v. Isham*, 261 Neb. 690, 625 N.W.2d 511 (2001).

## ANALYSIS

### MOTION TO SUPPRESS

Tyma's argument with respect to the disposition of her motion to suppress is somewhat imprecise. Her first assignment of error refers only to her contention that the handwriting samples she was ordered to submit should have been suppressed. In fact, they were. In the ruling on the State's interlocutory appeal from the suppression order, the single judge of the Court of Appeals held:

Having found that the affidavits establish probable cause to believe that a crime has been committed and that evidence thereof will be found in Tyma's residence, I reverse the district court's order suppressing the evidence secured in the search of her residence. *However, having found that the affidavit submitted in support of the order to obtain handwriting samples did not comply with the identifying physical characteristics act, I uphold the district court's suppression of the handwriting exemplars.* I remand the cause to the district court for Hall County for further proceedings consistent with this opinion.

(Emphasis supplied.) *State v. Tyma,* No. A-00-764, 2000 WL 1673125 at *10 (Neb. App. Oct. 31, 2000) (not designated for permanent publication). The handwriting samples were not offered at trial.

■ Tyma also argues that the evidence seized from her home should have been suppressed due to the inadequacy of the affidavits upon which the search warrants were based. This argument fails for two reasons. First, Tyma's assignments of error do not refer to the ruling of the Court of Appeals with respect to evidence seized from Tyma's home. An appellate court does not consider errors which are argued but not assigned. *State v. Becerra,* 253 Neb. 653, 573 N.W.2d 397 (1998); *State v. Lopez,* 249 Neb. 634, 544 N.W.2d 845 (1996). Second, Tyma does not identify any evidence seized from her home which was received at trial, and our review of the record reveals none. The State did offer several photographic prints made from undeveloped rolls of film seized from Tyma's residence, but the district court sustained Tyma's objections to the offer of these exhibits and did not receive them.

Although Tyma argues briefly that the affidavits did not contain a sufficient description of the weapon seized from the Leagos' home, she does not specifically assign error with respect to the refusal of the district court to suppress this evidence. Moreover, there is nothing in the record which would indicate that Tyma had a reasonable expectation of privacy in the Leagos' home. Tyma's first assignment of error is without merit.

## HANDWRITING IDENTIFICATION

In her second assignment of error, Tyma contends that the district court erred in permitting Tim to testify, over her foundational

objection, that her handwriting appeared on several documents which authorities obtained from Moore and Purvis. Neb. Rev. Stat. § 27-901 (Reissue 1995) provides in pertinent part:

(1) The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(2) By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . . .

(b) *Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.*

(Emphasis supplied.)

In *State v. Schwartz*, 239 Neb. 84, 474 N.W.2d 461 (1991), we held that the trial court did not err in permitting a motel clerk to testify that certain initials on motel register receipts were written by her coworkers. The clerk testified that her identification of the initials was based upon her familiarity with the handwriting of her coworkers gained in the course of her employment. We noted that because the clerk's familiarity with her coworkers' handwriting was not acquired for purposes of litigation, the requirements of § 27-901 were met and that the testimony was properly admitted.

The record in this case clearly establishes that Tim was familiar with the handwriting of Tyma and that this familiarity was not acquired for purposes of litigation. He testified that during the years that they lived together as a married couple, he observed Tyma's handwriting on a daily basis on notes written to him, calendars, and other family documents. This testimony satisfied the foundational requirements of § 27-901, and the district court did not err in receiving the testimony over Tyma's foundational objection.

## PURVIS TESTIMONY

In her third assignment of error, Tyma argues that the district court erred in permitting Purvis to testify at trial because he was an "inmate" within the meaning of § 29-2262.01, which provides:

> A person placed on probation by a court of the State of Nebraska, an inmate of any jail or correctional or penal facility, or an inmate who has been released on parole, probation, or work release shall be prohibited *from acting as an undercover agent* or employee of any law enforcement agency of the state or any political subdivision. Any evidence derived in violation of this section shall not be admissible against any person in any proceeding whatsoever.

On July 26, 2001, Tyma filed a motion in limine requesting that the court prohibit the State from calling Purvis as a witness. She asserted in the motion that Purvis' testimony would be in violation of § 29-2262.01 because he was "an inmate in a correctional or penal facility and/or was on parole at the time he was used to acquire information from the defendant." At a hearing on this motion held on the following day, the court noted that it was presented with no evidence concerning the applicability of § 29-2262.01 to Purvis. Tyma's counsel stated that he would "like to check on that issue and reserve the right to put forth evidence regarding his status." There was no further discussion of the motion at that hearing, and the record reflects no ruling on the motion.

The issue of Purvis' testimony next arose on the first day of trial. The court acknowledged receipt of a motion in limine filed by defense counsel on the preceding day, but that motion does not appear in the transcript. The court permitted Tyma's counsel to offer evidence on the motion prior to the commencement of trial. Through the testimony of a Hall County corrections employee, it was established that Purvis was booked into the Hall County jail at 5:10 p.m. on December 15, 1999, and released on his own recognizance at 6 p.m. the same day. Defense counsel also elicited testimony from Williams, the investigating officer, with respect to the motion in limine. Williams testified that he first came into contact with Purvis at approximately 2 p.m. on December 15, after learning from Tyma's roommate that Purvis and Tyma were conspiring to kill Tim. Williams further testified that he went to Purvis' house to question him and that his first contact with Purvis lasted only 5 minutes. Williams stated that upon leaving Purvis' home, he was told by a police dispatcher that an outstanding warrant for Purvis' arrest existed because Purvis had failed to pay a

fine. Williams testified that he then placed Purvis under arrest and that Purvis was transported to the Hall County Safety Center.

Williams testified that he questioned Purvis at the police station for approximately 2 hours concerning his involvement in an alleged conspiracy with Tyma to kill Tim. Williams testified that he neither paid nor promised anything to Purvis in exchange for Purvis' statement. Williams told Purvis, however, that if he continued to cooperate, Williams would talk with the county attorney about obtaining Purvis' release on a recognizance bond and not filing charges against Purvis for possession of a weapon that was found in his home. Williams then testified that after he finished questioning Purvis, he booked him into jail and called the county attorney, who informed him that only a judge could order a recognizance bond but that she would forgo filing a weapons charge if Purvis continued to cooperate. Williams testified that he called a county judge and requested that Purvis be released on a recognizance bond, which subsequently occurred after Purvis had spent approximately an hour in jail.

Williams further testified that after Purvis was released from jail, Purvis voluntarily came back to the police station, at which time Williams asked Purvis to wear a concealed recording device in an effort to record a conversation with Tyma. Williams stated that Purvis wore the device on two occasions and indicated that the first attempt failed to produce a recording but that the second attempt yielded a partial recording of a conversation between Purvis and Tyma.

At the conclusion of this evidence, the district court took the motion in limine under advisement and commenced trial. The State called Purvis during its case in chief. The record reflects no ruling on the motion in limine prior to Purvis' testimony. On direct examination, Purvis testified that he met Tyma outside a bar 2 or 3 months before his December 1999 arrest. He testified that between September and December, he had conversations with Tyma in which she stated that she wanted Tim to be dead. Purvis identified a pistol that Tyma had given him and testified that she had given him money on several occasions "because she wanted her husband dead." Purvis admitted having several conversations with Tyma "about killing her husband" and testified that Tyma had shown him photographs of Tim. Purvis identified

several handwritten notes given to him by Tyma during this period. He admitted that during the period Tyma was giving him money and sex, he told her he would kill Tim, although he had no intention of doing so. Defense counsel did not object to any portion of Purvis' direct testimony on the basis of § 29-2262.01.

On cross-examination, Purvis testified that he and Tyma had agreed that he would be paid $100,000 to kill Tim, but stated that he was interested only in continuing his sexual relationship with Tyma and had no intention of actually carrying out the murder. Purvis also confirmed that the State had agreed not to pursue certain criminal charges against him in exchange for his testimony. At the conclusion of Purvis' testimony, defense counsel stated that he was renewing the defense motion that Purvis' testimony be stricken pursuant to § 29-2262.01. The court overruled the motion, stating that it did not find the statute applicable.

■ Assuming without deciding that the issue was raised in a timely and appropriate manner, we agree that § 29-2262.01 does not make Purvis' testimony inadmissible. In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *State v. Portsche*, 261 Neb. 160, 622 N.W.2d 582 (2001). The plain and ordinary meaning of the language of § 29-2262.01 prohibits those placed on probation by a court of this state and inmates who have been released on parole by any court from acting as undercover agents for, or employees of, law enforcement agencies. The exclusionary rule provided by § 29-2262.01 does not apply unless the informant is both (1) in jail, on probation, or on parole and (2) acting as an undercover agent or employee of a law enforcement agency. *State v. McCormick and Hall*, 246 Neb. 271, 518 N.W.2d 133 (1994), *abrogated on other grounds, State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002). Purvis' trial testimony elicited by the State related exclusively to his contacts with Tyma during the months preceding his arrest and brief incarceration on December 15, 1999. The record contains no evidence that Purvis was an inmate, parolee, or probationer or that he was acting as an undercover agent or employee of a law enforcement agency during this time period. Although Purvis arguably served as an undercover agent when he subsequently

agreed to wear a hidden recording device in order to record conversations with Tyma, the State did not offer any evidence obtained in this manner. We conclude that the district court correctly determined that § 29-2262.01 did not require the exclusion of Purvis' trial testimony.

### SUFFICIENCY OF EVIDENCE

Tyma was convicted of criminal conspiracy, the elements of which are defined by Neb. Rev. Stat. § 28-202(1) (Reissue 1995) as follows:

> A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:
>
> (a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and
>
> (b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

In her fourth assignment of error, Tyma contends that the district court erred in finding her guilty of criminal conspiracy because there was no evidence that she entered into an agreement with either Moore or Purvis.

■ We have construed § 28-202 as adopting the unilateral approach to the agreement element of conspiracy as found in the Model Penal Code. *State v. Heitman*, 262 Neb. 185, 629 N.W.2d 542 (2001). See, also, *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995); *State v. Knight*, 239 Neb. 958, 479 N.W.2d 792 (1992); *State v. John*, 213 Neb. 76, 328 N.W.2d 181 (1982); Model Penal Code, § 5.03 (Tent. Draft No. 10, 1960). Under the unilateral approach, only the defendant need agree with another person; the second party can feign agreement. *Id.*

As noted above, our standard of review requires that we assess the sufficiency of the evidence to support a conviction by viewing it in a light most favorable to the State. *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002). Moore testified that Tyma approached him in early 1999 and soon thereafter began stating in numerous conversations that she wanted Moore to kill Tim. Moore identified a number of notes given to him by Tyma which clearly indicated that she wanted and expected Moore to

commit the murder. Moore also testified that Tyma initially suggested that Moore run over Tim with his car and later suggested that Moore shoot Tim. Moore stated that Tyma tried to provide him with a gun on two separate occasions and that she did provide him with ammunition and eventually offered to pay him $5,000 and then $10,000 to kill Tim. Moore testified that Tyma stressed the importance of accomplishing the killing before her divorce became final. On cross-examination, the following relevant colloquy occurred between Tyma's counsel and Moore:

Q You never reached any agreement with the defendant to hurt anybody, had you?

A She wanted me to do it. I can't — I wasn't going to do it. She reached an agreement with me, wanting me to do it. I never reached an agreement with her because I — I never had an intention of doing it.

Moore also testified that he led Tyma to believe that he was proceeding with the plot to kill Tim so that she would not do so herself or find someone else to commit the crime.

The handwritten notes which Moore stated that he received from Tyma are consistent with Moore's testimony. The notes can reasonably be interpreted as complaints that Moore had not carried out the killing of Tim as agreed. One note states in part:

You lied to me again - no show all weekend. You know this thing w/Tim needs to be taken care of tomorrow. Get w/me & get $. Get w/2 other guys & call friend & talk to those guys. They need to get to him now. 803 9th. St. Aurora. You've got pictures - need back. They need to go up to him & ask directions somewhere & get close enough to pull gun - slit throat. To be dead. Am I going to have to do this myself. I'm full w/kids. Help. You have time off work. This is a priority. I'll give you $ after. There'll be. Let's move. Can I trust you. Nothing works out & you do opposite of what you say.

Purvis testified that he became involved with Tyma between September and December 1999 and that during that timeframe, Tyma repeatedly asked him to kill Tim. Purvis testified that Tyma showed him pictures of Tim and gave Purvis a .25-caliber pistol because she "wanted her husband dead." Finally, Purvis testified that between September and December, he told Tyma that he

would kill Tim as she requested, although he had no intention of doing so. Purvis further testified that Tyma was periodically paying him small amounts of money to commit the murder.

Tyma argues that neither Moore nor Purvis entered into any "agreement" with her under traditional concepts of contract law because they admittedly had no intention of killing anyone. Thus, she contends, there was no meeting of the minds and no agreement. This argument ignores the unilateral approach to the agreement element of criminal conspiracy adopted by § 28-202, whereby the requisite agreement can be established by evidence that the defendant reached an agreement with another person to commit a criminal act, even if the agreement of the other person is feigned. For example, in *State v. Heitman*, 262 Neb. 185, 629 N.W.2d 542 (2001), we affirmed a conviction for conspiracy to commit first degree sexual assault on a child based upon evidence of an agreement reached through electronic correspondence between the defendant and a police officer posing as a 14-year-old girl. Viewing the evidence in the present case in a light most favorable to the State, as our standard of review requires, we conclude that it is sufficient to establish that Tyma entered into agreements with both Moore and Purvis to murder Tim, notwithstanding the fact that both Moore and Purvis feigned agreement. This assignment of error is therefore without merit.

## Speedy Trial

In her fifth assignment of error, Tyma contends that the district court erred in denying her motion to dismiss on the ground that she was denied her right to a speedy trial conferred by Neb. Rev. Stat. § 29-1207 (Reissue 1995). We treat the motion as one for an absolute discharge pursuant to Neb. Rev. Stat. § 29-1208 (Reissue 1995).

The State argues that we lack jurisdiction as to this issue because Tyma did not perfect a timely appeal from the order denying the motion. The order in the record was entered after trial contemporaneously with the finding of guilt, but prior to sentencing. Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002); *State v. McLemore*, 261 Neb.

452, 623 N.W.2d 315 (2001). We therefore initially address the jurisdictional issue raised by the State.

In *State v. Gibbs*, 253 Neb. 241, 245, 570 N.W.2d 326, 330 (1997), we held:

> Inasmuch as § 29-1207 confers a right to a speedy trial and § 29-1208 authorizes a special application to a court to enforce it, a ruling on a motion for absolute discharge based upon an accused criminal's nonfrivolous claim that his or her speedy trial rights were violated is a ruling affecting a substantial right made during a special proceeding and is therefore final and appealable.

In *Gibbs*, the motion for absolute discharge was denied prior to the scheduled commencement of trial and the defendant appealed the denial within 30 days. In concluding that the ruling affected a substantial right, we reasoned that the right to a speedy trial conferred by Nebraska statutes "would be significantly undermined if appellate review of nonfrivolous speedy trial claims were postponed until after conviction and sentence." *Id.*

In *State v. Jacques*, 253 Neb. 247, 570 N.W.2d 331 (1997), decided 1 week after *Gibbs*, we again considered a circumstance where a motion for absolute discharge was denied prior to the commencement of trial. In that case, however, the appeal was not perfected until after the trial was concluded and the defendant was convicted and sentenced. We affirmed the judgment of the Court of Appeals dismissing the appeal based upon a determination that the denial of the motion for an absolute discharge was a final, appealable order from which no timely appeal was perfected. Expanding upon our "substantial right" analysis in *Gibbs*, we reasoned that denial of a motion for discharge "effectively denies an appellant's speedy trial rights" and thus affects a substantial right. *Jacques*, 253 Neb. at 252, 570 N.W.2d at 335.

■ In this case, the district court did not rule on the motion to dismiss on statutory speedy trial grounds until after the conclusion of trial. In *State v. Ward*, 257 Neb. 377, 597 N.W.2d 614 (1999), we reasoned that a necessary concomitant to the right to immediately appeal from the denial of a motion to discharge, based upon an alleged violation of the right to a speedy trial, is the right to an appropriate pretrial disposition of the motion. We therefore held, prospectively, that

where a motion to discharge on speedy trial grounds is submitted to a trial court, that motion is inferentially denied where the trial court proceeds to trial without expressly ruling on the motion. At that point, the denial of the defendant's motion is a final, appealable order, and the defendant must secure his or her rights to appellate review by filing a timely notice of appeal.

*Id.* at 384, 597 N.W.2d at 619. Because there was no pretrial ruling on Tyma's speedy trial motion, it was inferentially denied when trial commenced on August 1, 2001. Under our holding in *Ward*, the notice of appeal filed on September 25, 2001, was untimely as to the speedy trial issue, and we therefore lack jurisdiction to consider its merit.

## Due Process

In her sixth assignment of error, Tyma contends that her right to due process was violated by the failure of the State to make pretrial disclosure of two matters: (1) the fact that Purvis had been granted immunity and (2) the fact that a tape containing a covertly recorded conversation between Purvis and Tyma had been lost by law enforcement authorities. Tyma argues that the dictates of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), required the prosecution to make such facts known to her prior to trial and that the failure to do so necessitated a mistrial or an order excluding certain evidence. Tyma concedes, however, that she did not raise these issues at trial by appropriate motion or objection.

In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as the trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court. *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995); *State v. Rust*, 247 Neb. 503, 528 N.W.2d 320 (1995). Plain error will be noted only where an error is evident from the record, prejudicially affects a substantial right of a litigant, and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Nelson*, 262 Neb. 896, 636 N.W.2d 620 (2001); *State v. Gutierrez*, 260 Neb. 1008, 620

N.W.2d 738 (2001); *State v. Hansen*, 259 Neb. 764, 612 N.W.2d 477 (2000). It is not evident from the record that the lost tape contained anything different from or additional to the transcript of the tape which was offered by Tyma and received without objection. The immunity granted to Purvis was brought out during his testimony and was therefore available to the finder of fact in assessing the credibility of his testimony. Under these circumstances, we find no basis for review of the claimed *Brady* violations under the plain error doctrine, and we decline to do so.

## CONCLUSION

For the reasons discussed, we lack jurisdiction to consider Tyma's assignment of error concerning the denial of her speedy trial motion. We conclude that her other assignments of error are without merit and affirm her conviction and sentence.

AFFIRMED.