STATE OF NEBRASKA, APPELLEE, V.
RONALD E. CANADAY, APPELLANT.
641 N.W.2d 13

Filed March 29, 2002.   No. S-01-150.

Thomas C. Riley, Douglas County Public Defender, and Gary D. Olson for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Following a bench trial in the district court for Douglas County, Ronald E. Canaday was convicted of conspiracy to commit first degree sexual assault on a child and sentenced to 5 years' probation. Canaday appeals, arguing there was insufficient evidence to convict him because the State failed to prove beyond a reasonable doubt that he was not entrapped.

## I. BACKGROUND

In 1995 and again in the fall of 1997, Det. Steven J. Henthorn of the Omaha Police Department placed an advertisement in "Express Contact," an adult magazine with strong sexual content. The advertisement was part of a proactive investigation designed to identify persons with a sexual interest in children. The advertisement read: "Single mom looking for right man who likes kids and understands needs!" The advertisement listed a Council Bluffs, Iowa, post office box and the name "Lisa," which name we will use when referring to any correspondence or contact between the Omaha Police Department and Canaday. According to Henthorn, the advertisement was purposefully

worded so that it identified children in a manner that was vague and open to interpretation.

On August 10, 1998, Henthorn received a letter from Canaday addressed to Lisa at the identified post office box in Council Bluffs. In the letter, Canaday wrote that he had obtained Lisa's name and address from "a list of women seeking men," which also included the phrases " 'Plain Mates' " and " 'love starved- man hungry-women.' " The letter gave Canaday's physical description and requested similar information about Lisa. Canaday wrote, "Being cautious, since I'm not sure of your feelings, I'll just say I Like Sex!" He concluded with a request to visit Lisa.

Henthorn testified that based upon his training in proactive investigation of child sexual offenders, there was nothing significant in Canaday's initial letter. Posing as Lisa, Henthorn sent a responsive letter to Canaday on September 10, 1998. The entire text of the letter read:

> Dear Ronald
>
> Thank you for writing. I have gotten several reply's [sic]. For some reason, yours caught my eye. I hope I am not making a mistake.
>
> I am 29, divorced and have three children. We are a very close family. I am trying to find someone to help with my children's special education.
>
> Someone who does not let society's views stand in the way. I have tried to be both mother and father to my children, but there are some things I am just not equipped to do. I hesitate to say more until I am sure you share my views. I hope you understand.
>
> /s/ Lisa

Henthorn testified at trial that the term "special education" is often used by persons with a sexual interest in children, the reference to "society's views" was purposefully vague, and the reference to "not [being] equipped" was meant to signify the lack of a male sex organ by the fictitious mother, Lisa.

Canaday responded in a letter received by Henthorn on September 17, 1998. In this letter, Canaday inquired as to what portion of his first letter attracted Lisa's attention. He also questioned why she referred to making a mistake and specifically asked, "Tell me what you are looking for? A friend? A mate? A

partner? A Husband?" He inquired about the ages of Lisa's children and whether they were boys or girls. He asked, "What kind of help with their 'special education'? What 'special education'? Please explain?" Canaday further wrote that he was not too worried about "society's views," although more explicit information from Lisa would be helpful. He wrote, "Lisa, I'm not complaining but your letter is very vague. I'd really like to understand. Please write and tell me some specific things about all the thing [sic] you eluded [sic] to in your letter." Henthorn testified that the inquiry about Lisa's children was significant because the advertisement had been placed in an adult magazine with an audience of adults seeking sexual partners, not personal relationships.

Lisa responded in a September 24, 1998, letter. In this letter, she wrote, "I have read your letter several times and I am not sure if you understand what I am looking for or not." She expressed fear of losing her children and stated, "I am looking to find the best teacher I can for my sweethearts [sic] special education. I want them to have the same kind of special memories that I do. My sweethearts are 12, 10 & 7. I have two girls and one boy. We are a very close family." Lisa concluded, "If you do understand I would love to hear back from you. If not please destroy my letters." Henthorn testified that the references to the "teacher" and potential loss of the children were intended to make it clear that the "special education" was sexual education for the children so that Canaday could extricate himself if he understood and was not interested.

Canaday responded in a letter received by Lisa on October 29, 1998. In this letter, he stated that there was a communication problem and that it was difficult to know if they shared the same views because he did not know what her views were. He wrote, "Maybe this will help — I am not with law enforcement, a postal inspector, or a morally righteous fanatic. I'm just a regular guy. No entrapment or judging other people." He then asked, "Is this 'special education' you are talking about associated with sex? Please don't be offended if not. I'm just trying to figure this out." Canaday wrote that he understood about trying to find the right partner in life and that he did not understand why Lisa would be worried about losing her children. He continued, "As for sex — I think that if everyone is agreeable to happenings then it's safe,

fun, and fulfilling. I sure wish I knew if this is what you are talking about. . . . Maybe I've helped you be 'safe and comfortable' with me and we can actually discuss this." Henthorn testified that Canaday's reference to not being associated with law enforcement was significant because it indicated that he was contemplating an illegal activity as opposed to a consensual adult sexual relationship. Henthorn also deemed it significant that Canaday associated "special education" with sex and that his reference to sex being "fun for everyone" indicated no age restrictions.

Lisa responded in a November 10, 1998, letter. She expressed the "strong feeling that you do share my views." She agreed that things should be safe, fun, and fulfilling and asked if Canaday was "comfortable teaching someone the ages of my sweethearts" and what he would "be comfortable teaching." Henthorn testified that these inquiries were intended to determine if Canaday found sex with children to be offensive.

Canaday's next letter was received by Henthorn on November 24, 1998. In this letter, Canaday stated "this would be a whole lot easier if you weren't so mysterious." He then asked if Lisa was affiliated with law enforcement because he wanted to be "sure I'm not getting 'suckered' in to [sic] something." Canaday wrote, "For now — Yes I believe I would be comfortable teaching your children." He asked, "Are we talking about teaching by example (demonstration by you and I)? Are we talking about teaching by 'hands on' experience (me physically teaching and you also physically teaching your kids)?" He indicated his understanding that Lisa was being cautious because she did not want to risk losing her children. He promised he was "not that type of person" and suggested that they meet personally or talk on the telephone so that they would both be more at ease. Henthorn testified that these passages further indicated Canaday's concern about the legality of the situation. Henthorn testified that this letter was significant because Canaday expressed comfort with "teaching" children, knowing that the teaching involved sex, and made the initial suggestion of personal or telephone contact with Lisa.

In his next response, Henthorn mistakenly sent Canaday a letter intended for another person, named "Dale," with whom the police, posing as Lisa, were also corresponding. The salutation of the letter read, "Dear Dale." The writer, Lisa, stated, "You are

right that I am only looking for a male teacher" and that when "I see the look of wonder and excitement in [the children's] eyes ... I know what I am doing is right. I want them to have very special memories. Society does not understand. I can only hope that you do."

In a responsive letter received by Henthorn on December 10, 1998, Canaday stated that he read Lisa's last letter several times and was confused until he realized that "you put Dale's letter in the envelope to me. I may be a little slow but I eventually overcome my confusion!" He again inquired,

Are you looking for a male as a partner? As a teacher along with you to teach your children about Love and Sex? By just talking to them or by visual aid (meaning you and I having sex in front of them)? Are you looking for a male to teach them by personal experience (having sex with them or aiding them in having sex with each other)?

Canaday concluded that if Lisa could answer his questions, he would know what would be expected of him. He also requested a photograph of Lisa and her children. Henthorn testified that this letter was significant because Canaday again referred to "physically having sex with the children and raises no opposition to that and doesn't tell us that that is something that he would not do." Henthorn further testified that Canaday's request for photographs was also significant because it sought personal contact.

Lisa responded in a December 14, 1998, letter to Canaday in which she apologized for sending the wrong letter and stated, "You were much nicer then [sic] Dale about it." She stated, "My sweethearts have made it clear that anything between me and their man teacher would upset them. Their teacher would be for them." She then stated that Canaday was "very close" about why she was being so cautious because "[m]y sweethearts are my life." She stated, "Trying to find a man teacher for them is the hardest thing I have ever tried to do. If I did not know it was what they want and need I would not continue my search." Henthorn testified that this letter was intended to make it clear that Lisa was not interested in a sexual relationship with Canaday.

Canaday responded in a letter which Henthorn received on December 30, 1998. He inquired as to how many men Lisa was corresponding with and then stated:

OK so I am a male teacher strictly for your children and will have no involvement with you. Correct? Could you maybe just give me a hint as to what I would teach them and how? I think we had established that sexual education was the goal. You still haven't told me how? I take it I would need to move to Council Bluffs. Right?

Later in the same letter, Canaday asked, "Wouldn't it be easier to get down to specifics and just be straight-forward and say exactly what would be expected of me if I am the 'man teacher' you select?" He also asked whether the children had any role in choosing their teacher. He asked Lisa to explain why the children would be upset if he and she were involved. He also asked, "Is this strictly a 'hands-on' situation with me and your children? . . . Am I to teach your children in the bedroom? Are you teaching your son?" Henthorn testified that these statements indicated that Canaday "finally understands that this is just between him and the children, and he just wants that to be affirmed." Henthorn interpreted this letter as a "clearer desire [on the part of Canaday] to teach the children in a sexual manner."

Lisa responded in a January 4, 1999, letter. She informed Canaday that she had been writing to two other men. She thanked him for understanding that there would be nothing between them and told him that the children were involved in picking the teacher. She informed him that he seemed to understand what he would be doing and stated he could use the bedroom or wherever he would be comfortable. She also stated that after her experience with the children's father, she did not want another man in her life. She concluded by asking if he was comfortable teaching one or all of her children and asked what he had in mind for the first lesson.

Canaday responded in a letter received on January 15, 1999. He stated that he really enjoyed Lisa's last letter and that he finally felt like they were getting somewhere and he was understanding things better. He asked whether the other two men were also going to be teaching her children. He stated that the logical place to start teaching was in the bedroom and that they should start with him getting to know the children and they him so that everyone felt comfortable. He wrote, "You ask — Would I be comfortable teaching your children? It would be new for me but

I think I could be comfortable with it if they are with me." He suggested that the first lesson would involve helping the children with their curiosities and making it informal and pleasurable so that they could learn to enjoy all aspects of sex. He gave his telephone number and indicated when he could be reached.

On January 20, 1999, Officer Teresa Thorson, posing as Lisa, placed a telephone call to Canaday. Henthorn was in the room with Thorson and listened to both sides of the telephone conversation, which was recorded on audiotape. In this conversation, Lisa informed Canaday that she wanted only one teacher for her children and repeatedly asked what lessons he had in mind. Canaday stated that he was "new at this too, as far as children" but that he wanted them to learn what they were curious about. At one point, Lisa said to Canaday, "If you're not comfortable, you just tell me." He replied that he could not state whether he was comfortable with something unless he tried it and further stated, "I've never tried it, so I can't tell ya for sure if I'm comfortable about it or not." Lisa told Canaday that he seemed to understand her and sounded like a good person. Although the conversation was initially somewhat vague, Canaday finally stated, "We're talking about sex here so let's just be honest." When Lisa asked him what kind of sex he would engage in with the children, Canaday suggested that the education would be "hands on" and asked whether the children would be comfortable with that. Lisa said that she had talked to the children about it and that they were "ready" and "excited." She asked if she could "watch" and requested that Canaday send her a written "lesson plan."

Canaday complied with this request in a letter received by Henthorn on January 26, 1999. He wrote that the most important thing was that "we are all comfortable with and can trust each other." He indicated that they would start by kissing and touching and eventually remove clothes. He indicated that this would be followed by oral sex and then intercourse.

Thorson, again posing as Lisa, placed a second tape-recorded telephone call to Canaday on January 27, 1999. In this conversation, Lisa asked whether Canaday "still want[ed] to teach my sweethearts" and whether he understood that this was reality and not a fantasy. He responded affirmatively. Lisa also confirmed that there would be no relationship between her and Canaday.

Canaday responded that he had received that impression from Lisa's letter, stating, "I don't quite understand it, but hey, whatever you want." When Canaday mentioned that he understood his role as providing "guidance" to the children, Lisa responded, "Ron, I am looking for a teacher, though." When asked how he wished to proceed, Canaday stated that he wanted all three children involved so that no one felt left out. Lisa told him that he seemed like an understanding person and that the children "all seem to be excited." Lisa stated that she was somewhat nervous and that she wanted to "make sure I am comfortable with choosing the right person." Canaday responded, "If you're not, you can say so, you know." Lisa replied that if Canaday was comfortable with the plan, she would be comfortable too. Canaday admitted that he was somewhat uncomfortable because "this is something new for me" and "if the wrong people found out, this is gonna be really bad." Lisa responded, "You're making me nervous. Maybe we shouldn't even do this." Canaday asked whether the children knew not to tell anyone, and Lisa responded, "They know that this is something that's just in the family" and that based upon her discussions with them, "they know what would happen if they told." She repeated that the children were "excited" and said "they think it's gonna be a—a wonderful experience." Lisa then said, "It's awful hard for me to believe that you haven't taught before because you just seem to understand so much." Canaday said that his first wife mentioned that he taught her a lot, but he thought they learned together. When Lisa asked if Canaday planned to "bring anything to help my sweethearts learn," Canaday asked what she was referring to and said that all he had were "some tapes" of "amateurs." Lisa asked if the tapes showed "children learning." Canaday said, "No . . . it's all adults." He said that he did not know what else he could bring, but that if Lisa had any ideas in this regard, she should let him know. Lisa then proposed a date for their meeting in a hotel room and told Canaday that her oldest daughter wanted to bake him a favorite food. Canaday suggested cheeseburgers. Lisa said she would call later in the week to confirm arrangements. Canaday stated that he was "not exactly rich" and asked who would pay for the hotel room. Lisa said that she would. She reiterated that the children were "excited" and "really looking forward to it."

Thorson, posing as Lisa, initiated another tape-recorded tele-phone conversation with Canaday on February 3, 1999. In this conversation, Lisa again stated that she was "nervous" and asked if Canaday still wanted to teach her "sweethearts." When Canaday said yes, she said that the children were excited and that she was excited for them. Lisa inquired whether he knew it was not just a fantasy, and he again responded affirmatively. When Lisa asked him if he wanted to start the lesson with her oldest daughter, Canaday said yes but expressed concern that if he was with her and Lisa was with her son, there was still one child left out. Lisa told him that she did not want to participate because this was to be a "special time" with him. Canaday stated he did not want anyone to have bad feelings but he was not comfortable having sexual relations with the boy, stating "I've never done that." Lisa again inquired whether Canaday knew that it was not a fantasy and that she was not interested in him sexually; he indi-cated that he understood. Canaday stated that he had never taught sex to children before and, when questioned by Lisa, further stated that he had never even thought about it before. He stated that once the idea was put to him, he was interested because help-ing someone else better understand their sexuality would make him feel good. When asked by Lisa to describe what acts he would engage in with the children so that she could discuss it with them, Canaday indicated that he would begin with kissing and touching, then oral sex and intercourse. During the conver-sation, Lisa frequently commented how "excited" the children were about the plan. Lisa told Canaday that the children had pur-chased new special underwear and that he should act surprised when he saw it. He replied that he would be surprised because "I'm still at a loss for any idea at all what you're exactly talking about." Lisa informed him that she had reserved a room at an Omaha hotel and made arrangements to meet him there.

Canaday met Thorson, posing as Lisa, at the hotel room on February 5, 1999. Their meeting was videotaped. Seated next to each other on a loveseat, Canaday and Lisa talked for approxi-mately 45 minutes. Lisa informed Canaday that she was nervous but would feel better if he could tell her exactly what was going to go on with the children. Canaday responded that he intended to do the things he described in the letter. Canaday confessed that he

was concerned about the "wrong people" finding out and that he was nervous he was getting set up and would have to go to jail. Canaday asked Lisa if the children would be disappointed when they saw him, and she responded no because she had taught them that a person is what is inside the heart. He stated he asked because he was used to people being disappointed with his looks, and Lisa told him he was a beautiful person. After several questions by Lisa, Canaday stated that he planned to start with the oldest daughter and that the younger boy and girl could watch and then try things they saw on each other if they wanted to. He stated that the activities would involve kissing, touching, and removing clothes, and then progress to oral sex and intercourse. Lisa showed Canaday pictures of the children, which she said were taken during a summer vacation at a nudist camp. She told him she had some difficulty getting the pictures developed and asked if he knew where she could get more prints. Canaday replied that he had no idea. Lisa showed him a magazine which apparently depicted nude pictures of children, and Canaday stated he had never seen such a magazine before. Canaday told Lisa about his girl friend who was incarcerated in Oklahoma and whom he eventually planned to marry. The girl friend had two young daughters, and when Lisa asked if he might teach them, he stated they had never talked about that, but the mother was pretty open about such things. Lisa asked Canaday if he was aware that this was reality, and he said he knew it was. She gave him a key to a room where the children allegedly were. After the conversation ended, Canaday entered the room and was met and arrested by Henthorn.

Canaday consented to a search of his vehicle, which resulted in the discovery of a bottle of baby oil, an unopened box of condoms, and a Polaroid camera. After he was advised of his *Miranda* rights, Canaday stated that he learned about Lisa in a "swinging magazine" and that he was at the hotel to teach her children about sex.

Henthorn testified that he conducted a background check on Canaday after the third letter and found no criminal history. He stated that Canaday's home was searched after his arrest and that no evidence of child pornography was found. Henthorn denied that the letters from Lisa suggested the "lesson plan" must involve physical sex.

Testifying on his own behalf, Canaday stated that he responded to the magazine advertisement in order to meet Lisa, not with the intention of having sex with children. Canaday, who was 44 years old at the time of trial, testified that aside from his first sexual experience at the age of 20, which involved a female hitchhiker who told him she was 16 but was actually 13, he had no sexual encounters with minor children. He said that he responded in his letters as though he was willing to have sex with the children in order to meet Lisa.

On cross-examination, Canaday testified that after "guessing at it," he understood that Lisa's references to "special education" dealt with sex. He admitted that he was the first to suggest telephone and personal contact with Lisa. He testified that he was making her believe he would have sex with the children but that he did not think she was serious. He testified that he went into the hotel room where Lisa told him her children were in order to "see what game she was playing." Canaday further testified that the condoms and baby oil had been in his vehicle since the fall of 1998 and that the camera was in his overnight bag so that it would not get dirty. He testified that he thought Lisa was just using a different approach to screening people that she wanted to meet.

On November 3, 1999, following a bench trial, the district court found Canaday guilty of conspiracy to commit first degree sexual assault on a child, noting that the paraphernalia found in Canaday's car strongly influenced its decision. On December 29, Canaday was sentenced to 5 years' probation. Canaday filed this appeal. Although the notice of appeal was filed within 30 days of the December 29 sentencing order which is included in the record, the notice refers to a December 12 sentencing order imposing a term of 12 to 36 months' imprisonment for the crime of first degree sexual assault.

## II. ASSIGNMENT OF ERROR

Canaday assigns that the State failed to prove beyond a reasonable doubt that he was not entrapped, and thus, there was insufficient evidence to find him guilty of the crime.

## III. STANDARD OF REVIEW

■ A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law,

which requires the appellate court to reach a conclusion independent of the lower court's decision. *State v. Ehlers*, 262 Neb. 247, 631 N.W.2d 471 (2001).

■ Facts constituting entrapment are ordinarily to be determined by the jury or trier of fact in each individual case, and findings will be disturbed on appeal only when the preponderance of the evidence against such findings is great and they clearly appear to be wrong, or when the findings are clearly contrary to law. *State v. Heitman*, 262 Neb. 185, 629 N.W.2d 542 (2001).

■ When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Redmond*, 262 Neb. 411, 631 N.W.2d 501 (2001); *State v. Heitman, supra.*

## IV. ANALYSIS

### 1. APPELLATE JURISDICTION

The State argues that we lack jurisdiction to hear this appeal because the notice of appeal refers to a sentencing order different from the sentencing order contained in the record. The record includes an order file stamped December 29, 2000, sentencing Canaday to 5 years' probation. The notice of appeal, file stamped January 26, 2001, is captioned, "The State of Nebraska, Plaintiff, vs. Ronald Canady [sic], Defendant" and includes the same docket number appearing on the sentencing order. However, it is clear that an error was made in preparing the notice of appeal because it recites a sentencing date, offense, and sentence which do not correspond to the order sentencing Canaday.

The statute governing the perfection of appeals, Neb. Rev. Stat. § 25-1912 (Cum. Supp. 2000), provides in pertinent part:

(1) The proceedings to obtain a reversal, vacation, or modification of judgments and decrees rendered or final orders made by the district court, including judgments and sentences upon convictions for felonies and misdemeanors, shall be by filing in the office of the clerk of the district court in which such judgment, decree, or final order was rendered, within thirty days after the entry of such judgment, decree,

or final order, a notice of intention to prosecute such appeal signed by the appellant or appellants or his, her, or their attorney of record . . . .

In a criminal case, the trial court must pronounce sentence before a criminal conviction constitutes a final, appealable order. *State v. Beyer*, 260 Neb. 670, 619 N.W.2d 213 (2000). Here, the notice of appeal was filed within 30 days of the final sentencing order in the record and, thus, meets the time restrictions of § 25-1912. The notice is signed by Canaday's attorney and in all other respects comports with the requirements of the statute. The notice reflects the same docket number as the sentencing order.

Although the erroneous information in the notice of appeal demonstrates the potential perils of careless word processing, we conclude that it does not defeat Canaday's right to appeal his conviction and sentence. It is clear from the record that the notice of appeal was timely filed on January 26, 2001, within 30 days from the valid final order of sentencing entered by the district court on December 29, 2000. It is equally clear that the notice was intended to effect an appeal from Canaday's conviction and sentence in this proceeding. Because the notice was timely filed and the erroneous reference to what was apparently a sentencing order in some other case is neither confusing nor prejudicial to the State, we conclude that we have jurisdiction to consider and resolve the appeal.

## 2. ENTRAPMENT

### (a) General Principles

Canaday was charged with conspiracy to commit sexual assault on a child. Criminal conspiracy is defined in Neb. Rev. Stat. § 28-202 (Reissue 1995), which provides in pertinent part:

(1) A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:

(a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and

(b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

■ Under the unilateral approach to the agreement element of conspiracy embodied in § 28-202, only the defendant need agree with another person; the second party can feign agreement. *State v. Heitman*, 262 Neb. 185, 629 N.W.2d 542 (2001); *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995). This approach applies equally when the party who feigns agreement is a government agent. *State v. Heitman, supra.* See, also, *State v. John*, 213 Neb. 76, 328 N.W.2d 181 (1982).

Section 28-202 further provides: "A person prosecuted for a criminal conspiracy shall be acquitted if such person proves by a preponderance of the evidence that his or her conduct occurred in response to an entrapment."

■ The only substantive issue presented in this appeal is whether the district court erred in rejecting Canaday's entrapment defense. Entrapment is the governmental inducement of one to commit a crime not contemplated by the individual in order to prosecute that individual for the commission of the criminal offense. *State v. Heitman, supra.* While " '[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises,' " government agents, in their zeal to enforce the law, may not "implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992), quoting *Sorrells v. United States*, 287 U.S. 435, 53 S. Ct. 210, 77 L. Ed. 413 (1932). See, also, *State v. Connely*, 243 Neb. 319, 499 N.W.2d 65 (1993).

■ In Nebraska, entrapment is an affirmative defense consisting of two elements: (1) the government induced the defendant to commit the offense charged and (2) the defendant's predisposition to commit the criminal act was such that the defendant was not otherwise ready and willing to commit the offense. *State v. Heitman, supra.* The burden of going forward with evidence of government inducement is on the defendant. *Id.* In assessing whether the defendant has satisfied this burden, the initial duty of the court is to determine whether there is sufficient evidence that the government has induced the defendant to commit a crime. *State v. Graham*, 259 Neb. 966, 614 N.W.2d 266 (2000). This determination is made as a matter of law, and

the defendant's evidence of inducement need be only more than a scintilla to satisfy his or her initial burden. *State v. Heitman, supra*; *State v. Graham, supra*. A defendant need not present evidence of entrapment; he or she can point to such evidence in the government's case in chief or extract it from the cross-examination of the government's witnesses. *State v. Heitman, supra*. When the defendant produces sufficient evidence to raise the defense, the question of entrapment becomes one of fact. *Id*. The burden is then on the State to prove beyond a reasonable doubt that the defendant was not entrapped. *Id*.; *State v. Connely, supra*.

In finding Canaday guilty, the district court stated:

> The charge here is criminal conspiracy. And after reviewing all of the evidence, Mr. Canaday, I am left firmly convinced that you are guilty of criminal conspiracy. I need to explain my process — my thought process here for you. I don't have any enthusiasm for the efforts to find out whether folks might be disposed to commit crimes. And I must say that throughout the process here, both you and the investigators for the State were walking a very thin line. In the end, what resolved the matter for me was the meeting that you had with the investigator that — where you brought along the paraphernalia that were going to be, by my view, used in the encounter with the subjects.

> It isn't an easy process and it's not — I didn't — I didn't have any enthusiasm in working on this, because I do think that both you and the investigators were coming as close as you could without stepping over the line either with entrapment or an offer. But the — the meeting that you had with the investigator and the material that you brought with you over from Iowa did leave me firmly convinced that the State had met its burden of proof.

Our review of the entrapment issue is complicated by the fact that the district court did not make specific findings on the issues of inducement and predisposition. However, rejection of the defense could have resulted from only two alternative factual findings: either the district court determined that the State did not induce Canaday to commit the offense charged or the court found that there was inducement but that Canaday was predisposed to

 

commit the offense. Accordingly, we review the record to determine its sufficiency to support either of these findings.

### (b) Inducement

Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representation, threats, coercive tactics, harassment, promise of reward, or pleas based on need, sympathy, or friendship. *State v. Heitman,* 262 Neb. 185, 629 N.W.2d 542 (2001). Inducement requires something more than that a government agent or informant suggested the crime and provided the occasion for it. *Id.* For example, we have held that a government agent's simple offer to purchase a controlled substance or inquiry about its availability for sale does not constitute an inducement of the person to whom the offer or inquiry was made. *State v. Graham,* 259 Neb. 966, 614 N.W.2d 266 (2000); *State v. Van Egmond,* 233 Neb. 834, 448 N.W.2d 569 (1989). Inducement consists of an opportunity plus something else, such as excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, noncriminal type of motive. *State v. Heitman, supra.*

The pertinent inquiry with respect to the issue of inducement in this case is whether the State went beyond simply providing Canaday with an opportunity to commit the offense. Our recent decision in *State v. Heitman, supra,* is illustrative. In that case, Heitman, a 53-year-old man, initiated the events by giving a 14-year-old girl working at a fast-food restaurant an envelope containing a sexually suggestive letter, money, condoms, and his e-mail address. After exchanging numerous e-mail messages with a police officer who was posing as the girl and eventually agreeing to meet the girl for a sexual encounter, Heitman was charged with conspiracy to commit first degree sexual assault on a child. In considering whether he was induced to commit the crime, we noted that the police officer sent "numerous e-mail messages aimed at affecting his emotions and desires," including messages indicating that the man was one of the few people who understood the girl and that the girl was looking for a sexual teacher. *Id.* at 200, 629 N.W.2d at 555. We also noted that it was the officer, posing as the girl, who first requested descriptions of

the sexual activity the man wished to engage in and that it was the officer who first suggested meeting for the purpose of a sexual encounter. We held that these facts established inducement to commit the crime, notwithstanding the fact that the trial court had not made a specific finding in this regard.

In *Heitman*, we cited and relied upon *U.S. v. Poehlman*, 217 F.3d 692 (9th Cir. 2000), in resolving the issue of inducement. That case involved facts strikingly similar to those before us here. Poehlman, a divorced male, visited " 'alternative lifestyle' " discussion groups on the Internet in an effort to find a companion. *Id.* at 695. He responded to an ad from an undercover agent posing as a woman named "Sharon," who indicated that she was a mother looking for someone who understood her family's " 'unique needs.' " *Id.* Throughout the ensuing e-mail correspondence, Sharon indicated that she was looking for someone to help with the " 'special education' " of her children who would be understanding and would " 'not let society's views stand in the way.' " *Id.* She made it clear that there could not be " 'anything between me and my sweethearts [sic] special teacher.' " *Id.* at 697. Eventually, Poehlman perceived that Sharon was looking for a male sexual mentor for her three daughters, ages 7, 10, and 12. At Sharon's prompting, Poehlman detailed the sexual acts he would teach to the children. Sharon later made telephone contact and arranged for Poehlman to meet her in a hotel room in another state. When she escorted him to an adjoining room to meet and teach her "children," Poehlman was arrested by law enforcement officials and subsequently charged with crossing state lines for the purpose of engaging in sex acts with a minor.

In concluding that Poehlman was induced to commit the offense, the court noted that while Poehlman was originally interested in a relationship with Sharon, she made it increasingly clear that his agreement to serve as a sexual mentor for her children was a condition of her own continued interest in him. Noting Sharon's repeated requests that Poehlman provide her with lesson plans, the court found a clear implication that unless he did so, Sharon would discontinue contact and seek another mentor. The court reasoned that the "government thus played on Poehlman's obvious need for an adult relationship, for acceptance of his sexual

proclivities and for a family, to draw him ever deeper into a sexual fantasy world" involving imaginary children. *Id.* at 702. The court concluded that "[t]hrough its aggressive intervention, the government materially affected the normal balance between risks and rewards from the commission of the crime, and thereby induced Poehlman to commit the offense." *Id.* at 702-03.

In the instant case, there is ample evidence that the State went beyond simply providing Canaday with an opportunity to violate the law. State agents made the initial references to children and brought up the issues of "special education," "society's views," and "special memories." Throughout the correspondence, and particularly in the telephone and videotaped conversations, Lisa repeatedly made it clear that she had made a firm decision about taking an active role in her children's sexual education and repeatedly informed Canaday about how "excited" the children were that he was going to be their teacher. Lisa told Canaday that she felt like he really "understood" her and understood what the rest of society did not. The overall implication of Lisa's correspondence with Canaday was that she was seeking someone who would realize, as she supposedly did, the value and benefits of teaching children about sex in a manner that society in general and law enforcement in particular would find objectionable. In that regard, she played on his emotions and desires. There is also evidence in the record that Canaday continued to seek an adult relationship with Lisa. By this evidence, especially Lisa's repeated statements to Canaday about her decision that a sexual education would be beneficial to her "sweethearts" and that he understood her while others did not, the State materially affected the normal balance between risks and rewards from the commission of the crime and induced Canaday to commit the offense. See *U.S. v. Poehlman*, 217 F.3d 692 (9th Cir. 2000). Because the State did more than simply present the opportunity to commit the crime, we conclude that Canaday was induced to commit the offense of conspiracy, and any contrary finding would be clearly erroneous.

### (c) Predisposition

Where the State has induced an individual to break the law, it must prove beyond a reasonable doubt that the defendant

was disposed to commit the criminal act prior to first being approached by government agents. *State v. Heitman*, 262 Neb. 185, 629 N.W.2d 542 (2001), citing *Jacobson v. United States*, 503 U.S. 540, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992). See, also, *U.S. v. Poehlman, supra*. Predisposition to commit the criminal act must be independent and not be the product of the attention of the government directed at the defendant. *State v. Heitman, supra*; *State v. Connely*, 243 Neb. 319, 499 N.W.2d 65 (1993). As we stated in *Heitman*, this is not to say that statements made after the government's inducement can never be evidence of predisposition. If, after the government begins inducing a defendant, he or she makes it clear that he or she would have committed the offense even without the inducement, that would be evidence of predisposition. *U.S. v. Poehlman, supra*; *State v. Heitman, supra*. However, only those statements that indicate a state of mind untainted by the inducement are relevant to show predisposition. *Id.* Predisposition may be shown by circumstantial evidence. *State v. Heitman, supra*. See, also, *State v. Parks*, 212 Neb. 635, 324 N.W.2d 673 (1982).

The distinction between predisposition which defeats an entrapment defense and criminal intent formulated only after governmental inducement is demonstrated by contrasting the facts in *Heitman* with those presented in both *Jacobson v. United States, supra*, and *U.S. v. Poehlman, supra*. In *Heitman*, we stated that predisposition could not be established by statements made by Heitman in correspondence with undercover police officers subsequent to inducement when the statements were indicative of his state of mind and intent at only that time. However, there was also evidence that Heitman initiated contact with the 14-year-old girl by giving her a sexually suggestive letter, money, condoms, and his e-mail address prior to any governmental involvement. Because the trial court considered and relied upon this evidence, we determined that its finding of predisposition was not clearly erroneous and affirmed the conviction.

In *Jacobson v. United States, supra*, law enforcement officials discovered Jacobson's name on the mailing list of an adult bookstore from which he had legally ordered certain publications. Subsequent to the order, the purchase of such publications became illegal under a newly enacted federal law. After 2½ years

of receiving various mailings from governmental agents, Jacobson ordered a magazine depicting children engaged in sexual activities. Following his arrest, a search of his home revealed no pornographic materials other than those sent by the government and those he had purchased legally prior to the government's solicitations. Reversing Jacobson's conviction of receiving child pornography through the mail, the U.S. Supreme Court held that the government had failed, as a matter of law, to prove a predisposition which was independent from and not the product of the mailings it directed to the defendant. Similarly, in *U.S. v. Poehlman*, 217 F.3d 692, 704 (9th Cir. 2000), the court held that no inference of predisposition could be drawn from the defendant's vivid e-mail descriptions of what he would teach "Sharon's" children because such statements did not "differentiate his state of mind prior to the government's intervention from that afterwards."

The acts described by Canaday in response to Lisa's repeated questions and requests for detailed "lesson plans" reveal nothing with respect to his predisposition prior to the State's inducement. Contrary to the district court's view, the items discovered in Canaday's vehicle following his arrest likewise do not bear on predisposition. Statements which Canaday made during the extended period of correspondence and conversations with Lisa actually negate a predisposition toward sexual interest in children. After several months of correspondence, Canaday replied to Lisa's inquiry about whether he would be "comfortable" teaching her children that "[i]t would be new for me but I think I could be comfortable with it if they are with me." A few days later, in the first telephone conversation between Canaday and Lisa, Canaday remarked that he was "new at this too, as far as children," and that "I've never tried it, so I can't tell ya for sure if I'm comfortable about it or not." In the second telephone conversation, Canaday again admitted that he was somewhat uncomfortable because "this is something new for me" and because he knew what they were discussing was illegal. In response to Lisa's question about whether he intended to "bring anything to help my sweethearts learn," Canaday mentioned that he had "some tapes." When Lisa asked if the tapes showed "children learning," he replied that the tapes depicted only adults.

During the third telephone conversation, Canaday stated that he had never taught sex to children, and until becoming acquainted with Lisa, he had never even thought about it. During the videotaped personal meeting, when Lisa showed Canaday nude photographs of her "children," he remarked that he had never seen such photographs before. When she asked him if he knew where she could have more reprints made, he said he had no idea. He spent much of the time telling Lisa about his own failed adult relationships.

As noted, the search of Canaday's home subsequent to his arrest revealed no child pornography or other indication of a sexual interest in children. He had no prior criminal record. The only evidence of any sexual contact with a minor was Canaday's admission that his first sexual experience at the age of 20 involved a female hitchhiker whom he believed to be 16 but later learned was younger. This isolated incident, occurring more than 20 years before the offense with which Canaday was charged, is simply too remote in time and circumstance to support an inference of predisposition.

The State argues that predisposition was shown by the mere fact that Canaday responded to the advertisement placed by Henthorn, which stated, "Single mom looking for right man who likes kids and understands needs!" This argument is tenuous at best in light of Henthorn's testimony that the advertisement was intentionally left "very vague and open to different interpretations." Although Canaday testified that he "probably" had purchased a copy of the magazine in which the advertisement appeared in the summer of 1998, he was not asked to identify the copy which was received in evidence. The advertisement, which Henthorn testified was placed no later than the fall of 1997, is not referred to by Canaday in his first letter to Lisa received on August 10, 1998, or in any subsequent communication. In the first paragraph of Canaday's initial letter, he stated that he received Lisa's name from a "list of women seeking men" and that the list contained the phrases " 'Plain Mates' " and " 'love starved- man hungry-women.' " This language does not appear in the advertisement placed by Henthorn. Canaday's initial letter contains no reference to children, and Henthorn conceded that based upon his training, he found nothing about the letter to be

significant. Under these circumstances, no reasonable inference can be drawn that Canaday's initial contact with Lisa evidenced any predisposition to commit an unlawful act. Based upon our review of the entire record, we conclude that there is no evidence upon which a rational finder of fact could conclude that Canaday had a predisposition to commit the offense with which he was charged prior to and independent of the State's inducement.

## V. CONCLUSION

The defense of entrapment serves to prevent law enforcement agencies from overstepping the "line between setting a trap for the 'unwary innocent' and the 'unwary criminal.'" *Jacobson v. United States*, 503 U.S. 540, 542, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992), quoting *Sherman v. United States*, 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958). See, also, *State v. Connely*, 243 Neb. 319, 499 N.W.2d 65 (1993). Based upon our review of the record in this case, we conclude that the State crossed the line by inducing Canaday to commit an offense which he was not otherwise predisposed to commit. Because it was clearly erroneous to conclude from this record that the State disproved entrapment beyond a reasonable doubt, Canaday's judgment of conviction and sentence is reversed and the cause is remanded with direction to dismiss.

REVERSED AND REMANDED WITH
DIRECTION TO DISMISS.